court has many times held. Miller v. State, 31 Tex. Cr. R. 636, 21 S. W. 925, 37 Am. St. Rep. 836; Hatcher v. State, 43 Tex. Cr. R. 239, 65 S. W. 97; Robinson v. State, 63 S. W. 869; Trotter v. State, 37 Tex. Cr. R. 468, 36 S. W. 278; Jones v. State, 33 Tex. Cr. R. 7, 23 S. W. 793; Morgan v. State, 31 Tex. Cr. R. 1, 18 S. W. 647; Sutton v. State, 2 Tex. App. 342; Roberts v. State, 48 Tex. Cr. R. 210, 87 S. W. 147; Miller v. State, 185 S. W. 38.

[7] The court did not err in permitting Mrs. Franklin, the neighbor lady whom Nellie called in to assist her with Lelia, to testify that Lelia told her who the party was who had caused her injury. The court did not permit the witness to tell who Lelia said this was, because her declaration at that time was not res gestæ. See cases collated in 2 Branch's An. P. C. p. 1001.

[8] Appellant complained of the action of the court in refusing to permit Nellie's older sister, Genie, to detail at considerable length, as shown by the bill, Nellie's conduct with one Feray. This, as we think, was irrelevant to any legitimate issue in the case. It is unnecessary to further state or discuss it.

[9] The record in many ways shows that the assaulted girl Lelia would neither testify nor talk to nor tell the attorneys, for either defendant or the state, the facts, or anything she would testify; in effect that she would not testify at all. Neither side introduced her or placed her on the stand. Under the circumstances, the statement by the county attorney in argument to the jury, to the effect that they could see the reason why he did not put her on the stand, as the jury easily saw, when he put the little boy on the stand, how he, owing to the influences of his father, was caused to change his testimony and attempt to clear his father by swearing falsely, presents no reversible error. An examination of the boy's testimony clearly justified such an inference as the county attorney stated shown above as to him, and, as stated by the county attorney, the jury doubtless could not help but see the reason she was not placed on the stand. The appellant attempted to make capital of the fact that the state did not place the girl Lelia upon the stand.

We have thoroughly considered the record in full and all of appellant's assigned errors. We are forcibly impressed with the fact that appellant had a fair and impartial trial; that his guilt was established without any doubt, and that his outraging his little innocent 8 year old daughter, horribly mangling her person in ravishing her, justified the jury to assess the death penalty; and, as the matters are presented, we cannot do otherwise than affirm this judgment, which is ordered. The judgment is affirmed.

HARPER, J., absent.

### On Motion for Rehearing.

PRENDERGAST, P. J. [10] Appellant now contends that the res gestæ statements of Lelia, testified to by Nellie, was secondary evidence, and inadmissible because the child Lelia herself did not testify, contending that her testimony would have been the best and primary evidence, and that Nellie's was secondary or inferior. He is mistaken in his contention. Res gestæ testimony is not secondary or inferior testimony. Presiding Judge White, in Cook v. State, 22 Tex. App. 526, 3 S. W. 749, says: "This rule as to res gestæ overrides all other rules known to the law governing the admissibility of testimony;" and in that case held that the res gestæ declarations of the wife were admissible against her husband, notwithstanding the statute which prohibits the wife from testifying against the husband. Robbins v. State, 73 Tex. Cr. R. 367, 166 S. W. 529; Shamblin v. State, 75 Tex. Cr. R. 498, 171 S. W. 718. The reason the child Lelia did not testify was explained in the original opinion.

[11] The offered testimony of Genie Marion which was excluded by the court did not show, or tend to show, any hostility, bias, or otherwise, affecting Nellie against her father. It would only have tended to have shown that she may have had some animosity against her sister Genie, but under no phase of the case was it admissible to show that Nellie had any feeling at all against her sister Genie. That had nothing to do with any issue in the case.

We have again examined the case thoroughly; and, as explained in the original opinion, the argument of the county attorney objected to, we are still of the opinion, showed no error against appellant, and we are of the opinion still that the testimony was not of sufficient force to show, or tend to show, that appellant was insane at or about the time he committed the alleged act. Therefore the court's action in refusing to charge on insanity was undoubtedly correct, and we think there can be no question but that under the law it was neither necessary nor proper for the court to have given a charge on circumstantial evidence.

The motion is therefore overruled.

---

### CITY OF FT. WORTH v. REYNOLDS.
### (No. 8454.)

(Court of Civil Appeals of Texas. Ft. Worth. Oct. 28, 1916. Rehearing Denied Dec. 2, 1916.)

1. MUNICIPAL CORPORATIONS �găă865(2)— DEBTS—PROVISION FOR PAYMENT—CONSTITUTION—"DEBT."

　　Where a city, to secure lands for a reservoir, contracted to pay the owner a fixed price per acre, and, if another owner secured a fixed price or more in condemnation proceedings, to pay an additional price per acre, but it failed to do so, and the landowner sued, if his petition

presented only an action on the contract to recover the excess price, the sum sued for was a "debt," within the meaning of Const. art. 11, §§ 5, 7, providing that no debt shall ever be created by any city unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest and create a sinking fund.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1837; Dec. Dig. ⬤⟳865(2).

For other definitions, see Words and Phrases, First and Second Series, Debt.]

**2. PLEADING ⬤⟳212—DEMURRER—WAIVER.**

In a landowner's suit against a city to recover the price of land sold the city for reservoir purposes and to foreclose an implied lien, where the petition did not affirmatively show that no provision had been made by the city, to provide for plaintiff's debt, when it was created, as required by Const. art. 11, §§ 5, 7, and the city's general demurrer was not called to the attention of, or acted upon by, the court below, the demurrer will be held to have been waived.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 521–524; Dec. Dig. ⬤⟳212.]

**3. PLEADING ⬤⟳433(2)—CONSTRUCTION AFTER VERDICT AND JUDGMENT.**

After verdict and judgment for plaintiff, defendant having waived its demurrer to plaintiff's petition, the petition should receive the most liberal construction, and should be held sufficient if its terms are broad enough to support recovery on any theory of facts.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 1454, 1455; Dec. Dig. ⬤⟳433(2).]

**4. ESTOPPEL ⬤⟳62(6)—VENDOR'S LIEN—ENFORCEMENT AGAINST CITY.**

Where a city, to acquire lands for a reservoir, purchased certain lands from plaintiff, but failed to pay part of the purchase money as agreed, the city could not keep and use the land for its own benefit and profit, and yet repudiate its obligation on the ground that its promise to pay was illegal, because, in creating the debt, it did not provide for its payment as required by Const. art. 11, §§ 5, 7.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 153; Dec. Dig. ⬤⟳62(6); Municipal Corporations, Cent. Dig. §§ 682, 917.]

**5. CONTRACTS ⬤⟳138(3) — ILLEGALITY—RECOVERY OF PROPERTY.**

Where property, real or personal, has been acquired by means of a contract forbidden by constitutional or legislative enactment, or otherwise unauthorized, the vendor, while he will be denied an enforcement of the illegal contract, may recover the specific property, in all cases where it can be clearly identified, by a return of all, if anything, that he may have received by virtue of the contract of sale.

[Ed. Note.—For other cases, see Contracts, Century Dig. §§ 688, 689; Decennial Dig. ⬤⟳138(3).]

**6. VENDOR AND PURCHASER ⬤⟳280(1)—ENFORCEMENT OF LIEN — PLEADING — PRAYER FOR RELIEF.**

In a landowner's suit against a city to recover the unpaid portion of the price of land sold it for reservoir purposes and to foreclose an implied lien, where plaintiff's petition, in addition to the prayer for specific relief, prayed "for all other and further relief, both legal and equitable, to which he may be entitled, both general and special," the prayer was broad enough to cover any relief, both legal or equitable, to which the plaintiff was entitled under the facts alleged and proven.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 784, 785, 789; Dec. Dig. ⬤⟳280(1).]

**7. VENDOR AND PURCHASER ⬤⟳254(1)—IMPLIED LIEN.**

In the absence of distinct waiver, equity raises a lien by implication in favor of a vendor to secure unpaid purchase money.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 634, 641, 648, 649, 651; Dec. Dig. ⬤⟳254(1).]

**8. MUNICIPAL CORPORATIONS ⬤⟳1038—FORCED SALE OF PROPERTY—CONSTITUTION.**

Where a city purchased land for a reservoir, failed to pay part of the price, foreclosure of a vendor's lien on part not used was not in conflict with Const. art. 11, § 9, providing that all property owned by a city for public purposes shall be exempt from forced sale, since, as between the city and the vendor, the beneficial title in equity never passed, and the legal title, if any, acquired by the city, was held in trust for the benefit of the vendor.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 2211; Dec. Dig. ⬤⟳1038.]

**9. VENDOR AND PURCHASER ⬤⟳98—RESCISSION—TENDER BACK OF CONSIDERATION—PARTIAL RESCISSION.**

Ordinarily a vendor of land cannot rescind the contract in whole or in part without tendering back all paid him by the buyer, and ordinarily a partial rescission and recovery of part of the land cannot be had.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 163–165; Dec. Dig. ⬤⟳98.]

**10. VENDOR AND PURCHASER ⬤⟳285(3)—PARTIAL RESCISSION—VENDEE'S RIGHT TO COMPLAIN.**

Where a city purchased land for a reservoir, but failed to pay part of the price and to use part of the land, so that the lands subject to the seller's lien were not in the city's actual use and could be detached from the lands in actual use without material injury to the uses originally designed, the city could not complain of judgment foreclosing the seller's implied lien on such part.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 803; Dec. Dig. ⬤⟳285(3).]

**11. EMINENT DOMAIN ⬤⟳75—CONDEMNATION OF LAND FOR RESERVOIR—PAYMENT.**

Private lands cannot be taken from the owner by a city for public use as a reservoir by an exercise of the right of eminent domain without paying therefor at the time of taking.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 198, 199; Dec. Dig. ⬤⟳75.]

**12. VENDOR AND PURCHASER ⬤⟳280(1), 285(2)—FORECLOSURE OF LIEN—DESCRIPTION OF LAND.**

In suit by the vendor of lands to a city, which failed to use part of them for a reservoir and to pay part of the price, to foreclose his implied lien on the lands not used, the description of the lands, in the petition and judgment foreclosing lien, as all "above high-water mark," was sufficient, the surveys being named and the approximate number of acres in each given; the term being well understood and easily ascertainable.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 784, 785, 789, 800–802; Dec. Dig. ⬤⟳280(1), 285(2).]

Appeal from District Court, Tarrant County; R. B. Young, Judge.

Suit by George T. Reynolds against the City of Ft. Worth. From a judgment for plaintiff, defendant appeals. Judgment affirmed, with modification.

---

⬤⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

T. A. Altman and B. L. Agerton, both of Ft. Worth, for appellant. Stephens & Miller and Sidney L. Samuels, all of Ft. Worth, for appellee.

CONNER, C. J. Briefly stated, George T. Reynolds instituted this suit on July 6, 1915, seeking to recover $6,637.20, with interest at 6 per cent. per annum from January 20, 1914, and to foreclose an implied vendor's lien upon parts of certain tracts of land located in Tarrant county, Tex., which it was alleged the city had purchased from the plaintiff on November 22, 1911. The plaintiff alleged that he and one D. H. Lucas were the owners of the parcel of land composed of a number of different surveys aggregating 663.72 acres, which the city desired to acquire for the purpose of using and appropriating the same in the establishment of a reservoir to supply the inhabitants of the city of Ft. Worth with water, and that on said November 22, 1911, the plaintiff and D. H. Lucas, joined by the wife of D. H. Lucas, executed a conveyance to the city of Ft. Worth to said 663.72 acres of land for a recited consideration of $26,584.80, or $40 per acre, which was paid in cash at the time; that at the time of this conveyance plaintiff and Lucas were insisting that the land was worth $50 per acre, but that it was finally agreed in writing, contemporaneously with said deed of conveyance, that $10 per acre additional should be paid for said land, in event that one Nettie Morgan should secure, on the final termination of a condemnation suit instituted by the city against her, $50 per acre or more for the land involved in said condemnation suit. It was further alleged that Nettie Morgan secured a final award in the condemnation suit against her of $65 per acre for her land on June 20, 1914, whereupon, by the terms of the agreement stated, the said additional sum of $10 per acre became at once due and payable, and that the plaintiff had, by due assignment, acquired all interest of said Lucas in the agreement referred to. The plaintiff further alleged that a part only of the land conveyed by himself and Lucas to the city was covered by the waters of the defendant's public reservoir, and the plaintiff sought judgment for his debt with a foreclosure of an implied vendor's lien upon such parts of the land so conveyed as are not covered by water.

The defendant in answer presented a general demurrer and a general denial, and pleaded specially that the lands described in plaintiff's pleadings had been purchased for the purpose of use for public municipal purposes, and were essential and necessary for the erection, maintenance, and protection of the reservoir and system of public waterworks for the city of Ft. Worth. This special answer, among other things, was denied by the plaintiff in a supplemental petition, and a contrary allegation was made, to the effect that the lands upon which the plaintiff sought to foreclose the vendor's lien are not in any way used by the defendant for the purposes set out in the answer, and that there is no necessity for the defendant to have owned or used said lands for the maintenance of its reservoir, and that the foreclosure of the lien will not, in any way, interfere with the maintenance of the reservoir or system of waterworks in the city.

The case was tried before the court without a jury, and on October 14, 1915, the court rendered a judgment in favor of plaintiff against the defendant for the sum of $7,177.02, and decreed a foreclosure of the vendor's lien upon all portions of the tracts of land described in the plaintiff's petition which lie above the high-water mark of the reservoir known as Lake Worth, comprising approximately 250 acres.

The court filed his conclusions of fact and of law, from which it appears that the conveyance from the plaintiff, Reynolds, and Lucas to the city, dated November 22, 1911, is a deed of general warranty, reciting as the total consideration the sum of $26,584.80, cash in hand paid. The deed does not contain any provision reserving a vendor's lien, and makes no reference to the agreement which was made contemporaneously with it. It was admitted that the plaintiff's allegations relating to the outcome and final disposition of the Morgan case were true, and the evidence is without contradiction to the effect that the defendant city erected a dam near the land purchased from the plaintiff, and that the same was completed in July, 1914; that the work of construction thereon had been in continuous progress for two or three years prior to that date; that the lands described in the plaintiff's petition were acquired by the defendant city for a reservoir to be used in connection with the general water supply for all purposes of the city; that water from the reservoir covered part of the land on June 20, 1914, and perhaps as early as 1913. The testimony is also without contradiction that the plaintiff knew when he conveyed the land to the defendant city that the defendant was purchasing it to be used for the purpose of erecting, maintaining, and protecting a reservoir and water system for the city of Ft. Worth. All of the land purchased by the defendant from the plaintiff is either covered by the waters of the reservoir, or drains directly into it, and is adjacent and contiguous thereto. Among other things, however, the court specially found that the portions of land upon which plaintiff was awarded the vendor's lien (about one-third of the whole) "lie entirely above the high-water mark of said reservoir as the said reservoir now exists," and that the foreclosure of the lien as prayed for by the plaintiff "will not materially interfere with the use by the city of Ft.

Worth of Lake Worth as a reservoir to supply water to the inhabitants of said city and for the extinguishment of fires."

Appellant's first assignment of error is to the alleged action of the court in refusing to sustain appellant's general demurrer to the appellee's petition, in that, as alleged, the cause of action appears to be based upon a contract made by a municipal government to pay money, and the petition does not allege a compliance upon the part of the city with sections 5 and 7 of article 11 of the Constitution of the state, nor is it alleged that the money to be paid under said contract had been provided for, or was for a current expense of the city government. The sections of the Constitution mentioned in the assignment (sections 5 and 7, article 11) provide, among other things, that:

"No debt shall ever be created by any city * * * unless at the same time provision be made to assess and collect annually a sufficient sum to pay the interest thereon and create a sinking fund of at least two per cent thereon."

[1] And if the plaintiff's petition must be construed as presenting alone an action upon the contract mentioned in the petition to recover the sum due by force of its terms, we would feel impelled, contrary to appellee's contention, to hold that the sum sued for was a debt within the meaning of the cited sections of the Constitution, and that hence the plaintiff's petition was subject to a general demurrer, for the want of necessary allegations bringing the case within those constitutional provisions. See McNeal v. Waco, 89 Tex. 83, 33 S. W. 322; Biddle v. City of Terrell, 82 Tex. 335, 18 S. W. 691; Kuhls v. City Laredo, 27 S. W. 791; Rogers National Bank v. Marion County, 181 S. W. 884; City of Austin v. McCall, 95 Tex. 565, 576, 68 S. W. 791; Ault v. Hill County, 102 Tex. 335, 116 S. W. 359; Berlin Iron-Bridge Co. v. City of San Antonio, 50 S. W. 408.

[2] But in this particular case, and as presented, we are of opinion that the assignment must be overruled. The record fails to show that the general demurrer was called to the attention of, or acted upon by, the court below. Ordinarily, at least, under such circumstances, it is held that the demurrer is waived. See Chambers v. Miller, 9 Tex. 236; Bonner v. Glenn, 79 Tex. 531, 15 S. W. 572; Railway v. Rollins, 89 S. W. 1099; Hales v. Peters, 162 S. W. 386; Texas Co. v. Earles, 164 S. W. 28; Railway v. Owens, 166 S. W. 412. No sufficient reason occurs to us why this application of the doctrine of waiver should not be given effect. The petition on its face does not affirmatively show that no provision had been made by the city to provide for the debt of the plaintiff at the time the debt was created, as required by the Constitution. There is a mere absence of allegations to such effect. The fact may have existed notwithstanding such want of allegations. If so, the petition could have been perfected by amendment, which, had the court's attention been called to the demurrer, the plaintiff might have done. The case, therefore, is distinguishable from those where the vice or illegality which is sufficient to defeat the action is shown to exist by the very terms of the pleading. In such later case it doubtless should be held that the defect in the pleading is fundamental in character, and can be urged at any stage of the trial.

[3] But if it must be said that the error complained of in the assignment is fundamental, and one that cannot be waived, it must certainly be true, in view of the waiver and after verdict and judgment, that the plaintiff's petition should receive the most liberal construction, and if its terms are broad enough to support a recovery in behalf of the plaintiff upon any theory of the facts, it should be held to be sufficient. See Townes' Texas Pleading, pp. 402–405, and cases cited.

[4] So construed, we think the plaintiff's petition shows facts entitling the plaintiff to a recovery, even though insufficient to entitle him to the precise relief specifically sought in his prayer. It therefrom appears that the defendant city, seeking to acquire lands for the purpose of establishing city waterworks, purchased from the plaintiff certain lands later occupied and used by the city in the accomplishment of its purpose; that a part of the purchase money as agreed upon at the time has not been paid, and that the lands upon which plaintiff sought to enforce a lien are not materially necessary to the establishment or maintenance of the city waterworks. Under such circumstances, it seems manifestly inequitable and unjust to permit the city to keep and use for its own benefit, and to its own profit, property not necessary for a municipal purpose and secured by a promise to pay therefor, and at the same time extend to the city the right to repudiate its obligation on the ground that its promise to pay was illegal.

[5] The obligation to be just and to do right rests upon all persons, natural or artificial, and hence there is a well-recognized line of authorities, which we approve, holding that in cases where property, real or personal, has been acquired by means of a contract forbidden by some constitutional or legislative enactment, or otherwise unauthorized, the vendor, while he will be denied an enforcement of the illegal contract, may recover the specific property in all cases where it can be clearly identified, by a return of all, if anything, that he may have received by virtue of the contract of sale. Thus, it was held by the Supreme Court of the United States, in the case of Chapman v. Douglas County, 107 U. S. 348, 2 Sup. Ct. 62, 27 L. Ed. 378, that where land was conveyed to a county for a poorhouse and farm under an agreement made by the county commissioners in excess of their authority to pay for it at a definite time, the

grantor on default of payment was entitled to a decree that the county surrender possession and reconvey to him, unless payment should be made of the amount due therefor within such reasonable time, to be fixed by the court, as would be necessary to raise the same by taxation. Numerous authorities were cited in support of the decision. In the case of Municipal Security Co. v. Baker County, by the Supreme Court of Oregon reported in 39 Or. 396, 65 Pac. 369, a like ruling in principle was made. While it was held in the later case that any voluntary agreement, entered into by a county involving certain liabilities after the boundary of its power to make contracts had been reached, was ultra vires, and that the receipt of benefits under the contract afforded no ground for invoking even an implied liability to pay any compensation therefor, yet that:

"Notwithstanding the incapacity of a municipal corporation, under such circumstances, renders its contracts unenforceable, those who have parted with their property in dealing with it during its interval of quiescence are not wholly remediless; for, when such property can be identified, the party entitled thereto may recover it by placing the other in statu quo; the rule being that neither party will be heard to allege the invalidity of a transaction which is simply ultra vires, while holding the fruits thereof."

This case also cites numerous authorities, to which may be added Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820, 29 L. Ed. 132; Bank v. Appleton, 216 U. S. 196, 30 Sup. Ct. 364, 54 L. Ed. 443; Rankin v. Emigh, 218 U. S. 27, 30 Sup. Ct. 672, 54 L. Ed. 915; Railway v. Railway, 66 N. H. 100, 20 Atl. 383, 9 L. R. A. 689, 49 Am. St. Rep. 582; 7 R. C. L. pars. 679, 680.

[6] The able city attorney, who appeared for appellant in this case, on submission substantially conceded the law as last above stated, but it was insisted that the plaintiff sought no such relief, and that in no event was a court authorized to foreclose a lien because of section 9, art. 11, of the Constitution, which declares, among other things, that all property owned and held by a city for public purposes only, or devoted exclusively to the use and benefit of the public, "shall be exempt from forced sale." But in addition to the prayer for the specific relief sought, the plaintiff's petition concluded with a prayer "for all other and further relief, both legal and equitable, to which he may be entitled, both general and special." The prayer, therefore, is broad enough to cover any relief, legal or equitable, to which the plaintiff is entitled under the facts alleged and proven.

[7] Under our law, in the absence of a distinct waiver, and none is shown in this case, equity raises a lien by implication in favor of a vendor to secure unpaid purchase money, and a special provision in the charter of the appellant city authorizes the city to create mortgage liens.

[8] As to the effect of section 9, art. 11, of the Constitution above cited, as will be

seen by reference thereto, it is to be observed that it only applies to property owned by the city and devoted exclusively to the use and benefit of the public. And the theory of the cases holding that a corporation may be required to restore property acquired by virtue of a contract it was forbidden to make is that, until paid for, as between the city and the seller, the beneficial title in equity never passes, and that the legal title, if any, thus acquired is held in trust for the benefit of the vendor. If, therefore, a vendor in a given case is shown to be entitled to recover the whole property, a mere foreclosure of a lien on the whole, or a part thereof, cannot make any material difference, for it is, in effect, but an indirect way of divesting the title and possession out of the unauthorized holder. When this effect can be given a decree of foreclosure, as we think it can here, as will hereinafter more fully appear, then no substantial or prejudicial conflict with section 9, art. 11, can reasonably be affirmed. We, therefore, are in no event inclined to say that no relief whatever can be granted the plaintiff under the allegations of his petition.

[9] It remains, however, to be determined whether the relief actually adjudged can be supported, for the judgment of the trial court is assailed on much the same grounds as has been the plaintiff's petition. It is clear, however, that the agreement on the part of the city was made as alleged, and that the city received and retained the land conveyed without the payment of $10 per acre as promised. Ordinarily, the plaintiff would not be entitled to rescind the contract, in whole or in part, without tendering back all that was paid by the city, and no such tender or offer was made by the plaintiff. Ordinarily, too, a partial rescission and recovery would not be upheld. Grady v. Pruit, 111 Ky. 100, 63 S. W. 283; Berlin Iron-Bridge Co. v. City of San Antonio, 50 S. W. 408.

[10] But in the case before us we fail to see that the city can justly complain of the judgment on these grounds. The court clearly finds that the lands originally conveyed are severable, and that the lands subjected to the plaintiff's lien are not in the actual use of the city, and may be detached from the lands in actual use without material injury to the uses originally designed; and there is evidence to support these findings. It is not pretended that the lands so segregated and applied to plaintiff's uses exceed in value the unpaid purchase money that the city contracted to give. Nor has the city offered to return the entire tract upon the return of the money paid, nor does the city pretend that the lands actually under water and actually devoted to necessary public use are worth less than the amount paid at the time of the purchase. Moreover, the rights of the city are fully guarded. Upon the submission, appellee offered to waive, as will be

herein adjudged, any right to an execution against the property of the city generally, consenting to look alone to the property upon which the lien was foreclosed. If, therefore, the said property is worth more, and shall sell for more, than is due from the city by the terms of its agreement, the excess, under the form of the decree, will be paid to the city. Or the city may prevent the sale altogether by paying off the judgment below. And in this connection it may not be amiss to observe that while the plaintiff's pleadings, as already stated, fail to affirmatively so show, it is nowhere insisted by the city, either in its pleadings, evidence, or briefs, that at the time of its original purchase no fund existed out of which it could have paid, or could yet pay, all that it had promised, as required by sections 5 and 7 of the Constitution. The record rather suggests that such a fund did exist, for the city was at the time engaged by condemnation suits and otherwise in acquiring lands upon which to erect a reservoir sufficient to hold all the water necessary for the use of a large city.

[11] Such lands, under our Constitution and laws, could not be so taken for public use, at least by an exercise of the right of eminent domain, without paying therefor at the time of the taking, and it is hardly reasonable to suppose that the city had not made provision for the necessary funds before undertaking so large a work.

We also wish to further observe that, while it would, perhaps, have been on this phase of the case technically more regular under the authorities to have given the plaintiff a proportional part of the land, the method adopted by the court, so declaring and foreclosing a lien, is in the interest of the city, as hereinbefore shown, and at most but an indirect method of accomplishing the same thing, particularly in view of appellee's offer to restrict his recovery to the lands upon which the lien was foreclosed.

There is a further contention that the lands upon which the court foreclosed the lien are insufficiently described, both in the plaintiff's petition and in the judgment. In both, however, it appears that the lands are composed of several different surveys which are named; that the approximate number of acres of each survey is given; and all declared to be above "high-water mark."

[12] We do not feel willing to state that the description so given will be insufficient to enable an identification of the lands. The "high-water mark of lands" is a term well understood and easily ascertainable. Many of the large engineering structures and maritime questions require a determination of high water and tide lines, and in the case of the construction of reservoirs the high-water mark of impounded waters may be determined by mathematical processes with at least approximate accuracy.

On the whole, we have concluded that the errors, if any, pointed out are more technical than substantial, and that all assignments of error should therefore be overruled, and the judgment affirmed upon the trial court's findings, which we approve, with the modification that no execution or other process for the enforcement of the judgment shall issue except such is necessary in the enforcement of the lien declared by the court below.

Affirmed.